IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUSLANS BONDARS,<br><br>Defendant. | CRIMINAL NO.: 1:16-CR-228<br><br>Hon. Liam O'Grady<br><br>Trial: May 7, 2018 |

**GOVERNMENT'S MOTION FOR A PRETRIAL RULING ON AUTHENTICATION OF COMPUTERS SEIZED ABROAD**

The government respectfully moves for a pretrial ruling conditionally admitting electronic evidence obtained from computers that were seized from the defendant's office and a Latvian internet service provider. The parties have stipulated that one of these computers was seized from the defendant's place of employment by the Latvian State Police (LSP), and the government will offer testimony from a LSP Officer regarding the seizure of the other computer. The government will also offer testimony from the FBI agent who received the computers from the LSP, as well as substantial evidence from the computers themselves showing that they contained documents and information that is unique to the defendant and the service he is accused of running (hereinafter, the "SERVICE"). The government does not intend to call LSP officer Dace Drozde, who had possession of the computers for the six weeks between when they were seized and when they were provided to the FBI, because Officer Drozde recently gave birth, is on maternity leave, and is supporting her husband who has surgery planned for May 3. The government respectfully submits that Officer Drozde's testimony is unnecessary because the evidence it intends to offer is more than sufficient to meet the low bar necessary for authentication.

## FACTUAL BACKGROUND

At trial, the government intends to call Special Agent Allan Vitkosky, who is the FBI's Assistant Legal Attaché (ALAT) in Latvia. ALAT Vitkosky will testify that he received a call at approximately 6:30 am Latvian time on April 26, 2017 informing him that, earlier that morning, Jurijs Martisevs had been arrested while attempting to enter Latvia from Russia and that the LSP was preparing to arrest Bondars and to execute search warrants on his residence, as well as his place of employment, Dyninno, and an internet service provider called "Telenet." ALAT Vitkosky will testify that he then met Officer Drozde, the head of the LSP's international cooperation unit, and rode with Officer Drozde and a team of LSP officers to execute a search warrant at Telenet. ALAT Vitkosky will testify that he attended the search of Telenet and, later, the search of Dyninno, as a guest of the LSP and was not permitted to touch any of the evidence. ALAT Vitkosky was, however, able to observe that the LSP conducted the search in a professional manner and saw the LSP working productively with representatives of Telenet to identify the servers associated with the IP addresses that were the subject of the Telenet search warrant and to begin the process of copying data from those servers. ALAT Vitkosky will further testify that, under the supervision of Officer Drozde and in the presence of representatives of Telenet, the LSP documented the evidence that they seized, which included electronics.

LSP Officer Janis Tikums will testify that he participated in the search of Telenet on April 26, 2017 and that he worked cooperatively with Telenet employees to identify the servers associated with the IP addresses that were identified in the Telenet search warrant and to copy the data from those servers. Officer Tikums will further testify that he was involved in the seizure of the "RUSLAN WEB01" computer tower and that the RUSLAN WEB01 tower was subsequently provided to Officer Drozde at the International Cooperation Unit.

During the afternoon of April 26, 2017 after the Telenet search had concluded for the day, ALAT Vitkosky will testify that he traveled with Officers Drozde and Tikums to Dynnino. When they arrived, ALAT Vitkosky will testify that Bondars had already been arrested and that a search of the office by multiple LSP officers was in progress. ALAT Vitkosky will testify that he observed the LSP conducting the search in a professional matter and that he observed the LSP, under the supervision of Officer Drozde and in the presence of representatives of Dyninno, document the evidence that they seized that day, which included electronics, and take possession of the evidence.[1] The parties have stipulated that on April 26, 2017 the LSP seized a computer tower with the insignia "Cooler Master" from Dyninno.

On May 19, 2017, the defendant voluntarily met with LSP officers and the FBI in Latvia in the presence of counsel. After being read his rights and signing a waiver form, the defendant made a number of statements—both orally and in writing—relevant to the authentication of the computers that are the subject of this motion. In particular, the defendant admitted that he handled the technical and IT work for the SERVICE, whereas Martisevs handled the advertising and customer support. He also admitted that he had a Skype account under the name "b0rland" and used the email address b0land7@gmail.com,[2] rus@leaping.net, and ru12.mob@gmail.com. The defendant indicated that he and Martiševs communicated primarily through the instant messaging services Jabber and Skype, and that most of his Jabber messages with Martisevs were "still available." Bondars repeatedly indicated that more information about the SERVICE was located on his computers.

---

[1] ALAT Vitkosky was not present for the search of the defendant's residence, which also occurred on April 26, 2017. The government does not intend to offer any electronic evidence from that search at trial and therefore will not address it in this motion.

[2] Bondars stated that he could not remember whether "Borland" was spelled with the letter "O" or the number "0."

ALAT Vitkosky will testify that, on June 9, 2017, he met with Officer Drozde at LSP headquarters in Riga, accompanied by the FBI's Legal Attaché to Latvia. At the meeting, Officer Drozde turned over all evidence seized from Telenet, Dyninno, the defendant's home, and from Martisevs's person,[3] including the "Cooler Master" and "RUSLAN WEB01" computer towers that are the subject of this motion. ALAT Vitkosky will testify that he returned to the United States embassy in Riga and prepared the evidence to be shipped the next day via Federal Express to SA Kim at the FBI's Northern Virginia Resident Agency (NVRA). SA Kim will testify that he received the computers via Fed Ex, confirmed that they matched the inventory he received from ALAT Vitkosky, and turned them over to the FBI's Evidence Control Center to be imaged by SA Andrew Kochy.[4] The government will offer a certification from SA Kochy confirming that Government Exhibits 197-198 contain, *inter alia*, exact image copies of the "Cooler Master" and the "RUSLAN WEB01" computer towers. In accordance with Federal Rule of Evidence 902(14), SA Kochy's certification confirms that the data is an exact copy of the originals via a commonly accepted practice of comparing the "hash values."[5] SA Kochy will testify that he shipped GX197-198 to Erik Uitto, who conducted a forensic examination of the evidence.

Through the testimony of Mr. Uitto, the government will introduce documents and photographs found on the Cooler Master computer that demonstrate the computer was used by the defendant. Specifically, the chart below summarizes some of these exhibits, as well as the evidence

---

[3] The government does intend to offer evidence from the computer and USB drive seized from Martisevs at the time of his arrest but is not seeking a pretrial ruling on the authentication of that evidence at this time.

[4] In order to avoid altering original evidence, the FBI does not examine electronic evidence in its original form. Instead, they create exact copies of the evidence, known as "images," and review the images.

[5] *See* Fed. R. Evid. 902(14), Advisory Comm. Note ("Today, data copied from electronic devices … are ordinarily authenticated by 'hash value'…. If the hash values for the original and copy are the same, it is highly improbable that the original and copy are not identical").

the government will offer to demonstrate that these exhibits are authenticate and contain information that is unique to the defendant.

| **Ex.** | **Description of Exhibit Found on Cooler Master** | **Corroboration of Information in Exhibit** |
|---|---|---|
| GX226 | Photo of Latvian passport in the name Ruslans Bondars with expiration date March 16, 2014 | The government will admit a photo of the same passport that the defendant attached to an email sent from b0rland7@gmail.com, which the government obtained from Google. |
| GX227 | Photo of Latvian passport in the name Ruslans Bondars with expiration date March 31, 2009 | SA Kim will identify the passport as Bondars's based on the photograph and date of birth. |
| GX228 | Verification form for ePassporte online payment service account in the name Ruslans Bondars and email address b0rland7@gmail.com | SA Kim will testify that Bondars admitted that b0rland7@gmail.com was his email account, and the government will offer subscriber information from by Google confirming that b0rland7@gmail.com is Bondars's email account. In addition, the government will offer several automated emails from ePassporte to b0rland7@gmail.com providing notice about activity on his account and stating the account name a "b0rland." *See* US-49090, US-49100, US-49101, US-49143, US-122120, US-112473. |
| GX231 | Statement from Citibank account in the name of Ruslans Bondars with account number ending in 6342 and listing Bondars's home address | The government will introduce an email obtained from Google sent from b0rland@gmail.com that attaches a number of personal and financial documents including a Citibank statement that appears nearly identical to GX231 *See* US-11267-78. The government will also offer several emails from Citibank to b0rland@gmail.com concerning an account ending in 6342. *See* US-112575, 112643, 112683, 112724, 112775, 112801. Finally, the government will offer emails sent to and from b0rland7@gmail.com containing a same street address associated with the Citibank account, including one where Bondars himself provides that address and attaches a photo of his passport. *See* US-115487, US-114529, US-114597, US-115487. |
| GX234 | Boarding pass for Scandinavian Airlines flight from Riga to Pula, through Stockholm, on June 19, 2015 in the name of Ruslans Bondars | |
| GX235 | Boarding Pass for Air Baltic flight from Riga to Vienna on Dec. 22, 2014, in the name Ruslans Bondars | |
| GX236 | Roundtrip bus ticket from Riga to Tallinn leaving July 12, 2014 in the name Ruslans Bondars | The government offer an identical ticket that was stored on Bondars's Google Drive for his account ru12.mob@gmail.com, which the government obtained from Google. *See* US-122461. |
| GX237 | Statement signed by Ruslans Bondars that includes his national identification number and his address. | Bondars's address will be confirmed through his emails, as noted above. The national identification number is the same as the ones on the passports found on this computer and the passport that Bondars himself sent from his email account. |
| GX161<br>GX163<br>GX165 | Email confirmations from WHOIS for particular domain names registered using the email address b0rland7@gmail.com | The government will offer identical emails obtained from Google years earlier. |

Forensic Examiner Uitto will further testify that, on the image of the RUSLAN WEB01 computer tower, he found a string of computer code, known as a "script," in the folder: /hom/rus/av/bk/www2/gearman/test_notify.php that contained the following email addresses: b0rland7@gmail.com, rus@leaping.net, and ru12.mob@gmail.com, among others. Uitto will testify that the script appears to have been written by the administrator of the SERVICE in order to send automated error notifications related to the SERVICE to those email addresses. SA Kim will testify that the defendant admitted that those email addresses were his. Uitto will further testify that the Cooler Master and RUSLAN WEB01 computer towers both had user accounts named "root" and "rus." "Rus," of course, is a shortened version of the defendant's first name.

The Cooler Master computer also contained evidence confirming that it was used in connection with the SERVICE. For instance, Mr. Uitto will authenticate the Firefox internet history found on the Cooler Master computer, which shows that it was used to visit the SERVICE's website over 300 times, and to visit the website leaping.net, Mr. Bondars's personal website. He will also testify that the Cooler Master was used to visit hackforums.net and exploit.im. Both of these forums are devoted to discussion of hacking and the sale of hacking tools, and both are forums where the SERVICE advertised. Additionally, Mr. Uitto will testify that he observed on the Cooler Master computer text related to the SERVICE and a SERVICE insignia.

Forensic Examiner Uitto will further testify that the Cooler Master contained a folder that was hidden and heavily encrypted. This folder contained numerous electronic communications (or "chats") between Bondars and several contacts via the instant messaging services Skype and Jabber. This included numerous Jabber and Skype chats between Bondars and Martisevs concerning their work together on the SERVICE, as well as several other related computer intrusion schemes. As noted above, Bondars admitted that his Skype account was "b0rland." The

Skype chats found on the Cooler Master computer were all between the account "b0rland" and other parties, indicating that the "b0rland" account belonged to the owner or primary user of the Cooler Master. There are numerous Skype chats between b0rland and the Skype account "beaverma," who often used the display name or "Garrik," and "Jur4ik." Skype registration information shows that the "beaverma" account was registered to "Jurijs Martisevs." *See* US-41254. Moreover, the government will offer messages obtained from Google from beaverma@unknown.person to ru12mob@gmail.com signed by "Jurik" and "Garrik." *See* US-138963, 139006, 139080, 139124, 139137, 139165, 139172, 139187. The government will also introduce instant messages obtained from Google between ru12.mob@gmail.com and an account named "Jur4ik" *See* US-139281, 139353, 140553, 140567, 140577, 140719, 140873, 140873, 140907-08. The Jabber chats were all between the Jabber account "qukufawu" and other accounts, indicating that the owner of the Cooler Master computer used the name "qukufawu." The government will introduce an email from Martisevs to a SERVICE customer which indicates that the administrators of the SERVICE used the Jabber names "Garrik" and "qukufawu." *See* US-30984. There are numerous Jabber chats between Qukufawu and the Jabber names "Garrik," and "bentwent," discussing the SERVICE.

The substance of the Skype and Jabber conversations between Bondars and Martisevs also contained information confirming their authenticity. The two discussed the SERVICE in specific detail, which matches Bondars's admission that he and Martisevs were the administrators of the SERVICE. SA Kim will also testify that he was able to independently corroborate some of the information contained in the chats. For instance, on December 7, 2015, Bondars and Martisevs discussed published reports that their co-conspirator was arrested in the United Kingdom for running a related counter-antivirus service called "reFUD.me." Bondars then stated the he

"cleaned up the news." The government will introduce screen shots of the SERVICE's website in February 2016 showing that, after Bondars made this statement, references to reFUD.me were indeed taken off the "news" section of the SERVICE's website.

At trial, the government intends to offer these Skype and Jabber chats between Bondars and Martisevs into evidence. These chats, which were summerized in the government's opposition to the defendant's motion to suppress, contain detailed discussions of the fact that the SERVICE is being investigated by the United States and that the two could be arrested, of the names of the criminal forums on which the SERVICE advertized, and of many computer intrusion schemes that Bondars and Martisevs planned to perpetrate, including at least one using the SERVICE.

Finally, Mr. Uitto will testify that the forensic data indicates that neither the Cooler Master nor the RUSLAN WEB01 computer were accessed or altered in any way since the time of their seizure by the LSP. Uitto will further testify that the Jabber and Skype chats were in a heavily encrypted folder that would have been very difficult for an unauthorized person to access and nearly impossible for anyone to access and modify after the time of the seizure of the Cooler Master by the LSP without leaving forensic evidence of such modification.

## Legal Standard for Authentication

### A. Pretrial Rulings on Authenticity Are Appropriate and Encouraged.

The Fourth Circuit has advised that pretrial rulings on authentication are "appropriate" and "may be preferable." *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992). In *Branch*, the defendant objected to the district court's pretrial ruling conditionally admitting intercepted tape recordings. In rejecting the defendant's argument, the Fourth Circuit explained that, because authentication is "a special aspect of relevancy," determinations of authenticity are "governed by the procedure set forth in Federal Rule of Evidence 104(b) relating to matters of conditional relevance generally." *Id.* (internal quotations omitted). Rule 104(b) provides that

"[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." Thus, the Fourth Circuit reasoned, a district court can make a preliminary, pretrial determination that the government has made a prima facie showing that evidence is authentic, and thus relevant, and admit the evidence on the condition that the government introduce the promised foundation evidence at trial. *Branch*, 970 F.2d at 1371 ("even though the district court may have ruled during an in camera proceeding that the proponent had presented sufficient evidence to support a finding that a tape recording was authentic, evidence that would support this same ruling must be presented again, to the jury, before the tape recording may be admitted.").

The Fourth Circuit found such pretrial rulings "appropriate" and potentially "preferable" because, among other advantages, "[t]his procedure insures that the jury will not be tainted by hearing prejudicial evidence—or learning of its existence—until the proponent has demonstrated that it will be able to provide an adequate foundation for admission." *Id.* Several courts have exercised their power under *Brach* and Rule104(b) to make pretrial ruling on authenticity. *See, e.g.*, *United States v. Scott*, 2014 WL 2808802, at *2-3 (E.D. Va. 2014); *United States v. Calhoun*, 2011 WL 6130794, at *5 (S.D.W. Va. 2011); *United States v. Turner*, 2014 WL 4703468, at *4–5 (N.D. Ill. 2014), *aff'd*, 840 F.3d 336 (7th Cir. 2016). In this case, this procedure has the additional advantage of saving the Court time and the government resources by eliminating potentially unnecessary chain of custody witnesses who would otherwise have to travel to the United States from Latvia. *See* Fed. R. Evid. 102 ("These rules should be construed so as to … eliminate unjustifiable expense and delay" and "to the end of ascertaining the truth and securing a just determination").

### B. The Bar for Authentication is "Not High" and Only Requires a "Prima Facie" Showing.

"The factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009). "The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.* The government's burden to authenticate under Rule 901 "is not high—only a *prima facie* showing is required." *Id.; see also United States v. Pantic*, 308 F. App'x 731, 733 (4th Cir. 2009). "The Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so." *Vidacak*, 553 F.3d at 349 (quotations omitted, emphasis in original).

The mere possibility that evidence could have been altered is not sufficient to remove the evidence from the jury's consideration. *See United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994) ("Merely raising the possibility of tampering is not sufficient to render evidence inadmissible …"); *United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006)("Absent specific evidence showing alteration, however, the Court will not exclude any embedded e-mails because of the mere possibility that it can be done."). Rather, once a prima facie showing of authenticity has been made, any argument that the evidence may have been altered must be made to the jury. *See Tienda v. State*, 358 SW3d 633 641 (Tex. Crim. App. 2012) ("It is, of course, within the realm of possibility that the [defendant] was the victim of some elaborate and ongoing conspiracy…. But that is an alternate scenario whose likelihood and weight the jury was entitled to assess"); *United States v. Wilson*, 973 F.2d 577, 580 (7th Cir. 1992) (recordings properly admitted where the defendant "merely surmise[d] that because the tapes were not in the sole custody of the government, someone may have altered them").

### C. Evidence Can Be Authenticated Based on Distinctive Characteristics of the Evidence Itself; This Method Is Frequently Used To Authenticate Electronic Evidence and Evidence Obtained from Abroad.

Direct or "chain of custody" evidence is just one way to authenticate evidence and is especially important for evidence such as narcotics, which tend to be non-distinct. *See United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989) ("Cocaine, [which is] not uniquely identifiable, requires a sufficient chain of custody to support its admission."). But chain of custody evidence "is merely one possible means of authentication and not … an exclusive requirement." *United States v. Browne*, 834 F.3d 403, 411–15 (3d Cir. 2016). Rather, "[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics." *United States v. Smith,* 918 F.2d 1501, 1510 (11th Cir.1990).

Evidence may be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Rule 901(b)(4) is "one of the most frequently used to authenticate … electronic records." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 554–55 (D. Md. 2007). Indeed, courts have repeatedly upheld the admission of computers and other electronic evidence, even in the absence of chain-of-custody evidence, based solely on identifying evidence found on item itself. *See, e.g., United States v. Reed*, 780 F.3d 260, 265-67 (4th Cir. 2015) (holding that "the government proffered evidence that the jury could use to attribute" a particular phone to defendant Dyer, despite offering "no testimony about how this phone was seized," because there was evidence of "photos of Dyer on the phone and text messages attributing the number to Dyer, including several that used … his first name"); *United States v. Siddiqui*, 235 F.3d 1318, 1322–23 (11th Cir. 2000) (email authenticated by the use of the defendant's email address and nickname, as well as its contents which included information the defendant would know); *United*

*States v. Fluker*, 698 F.3d at 999-1000 (7th Cir. 2012) (same); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (cell phones authenticated in part by information on the phones themselves such as "properties," "contacts," and communications associated with the defendant).

Evidence obtained from outside of the United States is also frequently authenticated under Rule 901(b)(4) without showing an unbroken chain of custody. *See United States v. Collins*, 715 F.3d 1032, 1035-36 (7th Cir. 2013) (holding that chain of custody "would be an impossible standard" for foreign evidence and approving admission of audio tapes created in Mexico based on voice identification and distinctive characteristics of the recordings); *United States v. Dumeisi*, 424 F.3d 566, 574-75 (7th Cir. 2005) (finding a file from Saddam Hussein's former Iraqi Intelligence Service was properly authenticated based on "distinctive characteristics" of the documents themselves, "including the style and form of the documents" as well as the circumstances relating to the file recovery); *Xiao Wei Yang Catering v. Inner Mongolia, Inc.*, 2017 WL 507211 (D. Mass. 2017) (Chinese government screenshots authenticated based on substance and internal patterns). When chain of custody evidence is used to authenticate foreign evidence, courts can consider the chain of custody beginning when U.S. authorities first receive the evidence. *See Collins*, 715 F.3d at 1035-36 ("We acknowledge that Flores did not testify at trial and that no government agents were present when Flores made the recordings" in Mexico but noting that the recordings "never left the government's possession after the moment of receipt").

The Fourth Circuit's decision in *United States v. Vidacak*, 553 F.3d 344 (4th Cir. 2009) is instructive on this point. There, the government offered records that purported to have been created by the Zvornik Brigade, a portion of the Army of the Republika Srpska ("VRS") that was accused of war crimes during the Bosnian civil war. The documents were seized from Zvornik

Brigade headquarters in 1998, three years after the end of the civil war, by agents from the International Criminal Tribunal in The Hague. The defendant challenged the authenticity of the documents because, although the government called a witness from the International Criminal Tribunal who was involved in the seizure and subsequent storage of the documents, the government did not call anyone from the VRS and thus could not "account for the approximate three year gap between the creation of the documents and their seizure in 1998." *Vidacak*, 553 F.3d at 348–49. The Fourth Circuit rejected this challenge, relying heavily on distinctive characteristics of the documents themselves, including "unique indexing numbers that rendered them readily identifiable as VRS records that dated to the period of the Bosnian Civil War." *Id.* at 351. Therefore, there was "sufficient circumstantial evidence" to authenticate the documents, "despite the fact that the government could not trace the precise history of the documents prior to their seizure." *Id.* Finally, the court noted that the defendant "offered no basis for inferring that the exhibits were forged or altered." *Id.*

## **Argument**

The government intends to authenticate the Cooler Master and the RUSLAN WEB01 computers through the following evidence:

- Testimony and a stipulation demonstrating that the LSP seized these computers from Dyninno and Telenet around the time of the defendant's arrest and that the LSP subsequently provided them to the FBI;
- Evidence that the computers themselves contained authentic documents that only the defendant who have access to, including copies of his passport, sensitive documents related to his bank account, and documents containing his personal identifying information;
- Evidence that information in the specific documents that the government seeks to admit tie to the defendant, including the fact that the instant message chats were from unique Skype and Jabbers accounts that can be independently tied to the defendant and his co-conspirator, Jurijs Martisevs; and
- Evidence that the computers contained distinctive information about the SERVICE that only the SERVICE's administrators were likely to know.

The government respectfully submits that each of these means of authentication are independently sufficient to make a prima facie showing of authentication and that, taken together, this evidence far exceeds that minimal showing that is required.

**A. Chain of Custody Testimony**

The government will present "testimony of a witness with knowledge" for each of the devices in question. Fed. R. Evid. 902(b)(1). LSP Officer Tikums will testify that he was present at the Telenet search and involved in the seizure of the "RUSLAN WEB01" computer tower. In addition, the parties have stipulated that the LSP seized the "Cooler Master" computer tower from the defendant's place of business, Dyninno, on April 26, 2017. Officer Tikums will testify that the RUSLAN WEB01 tower was provided to Officer Drozde at the International Cooperation Unit. Similarly, both Tikums and ALAT Vitkosky will testify that they witnessed Drozde supervising the search at Dyninno and will testify that Drozde would have taken possession of all evidence seized from Dyninno. ALAT Vitosky will further testify that, on June 9, 2017, he received all the computers from Officer Drozde and shipped them to SA Kim, who will testify that he received the evidence and provided it to SA Kochy to image. Because Officer Drozde is on maternity leave, the government does not intend to have her travel from Latvia to testify unless it is necessary. Thus, there will be a gap in the chain of custody between from when the computers were seized in late April 2017 to when they were provided to the FBI six weeks later.

It is well established, however, that "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) (internal quotations and alterations omitted); *accord United States v. Williams*, 103 F.3d 122 (4th Cir. 1996). This is especially true where any "gap" in the chain of custody occurred while the evidence was located abroad and in the possession of a foreign

government. *See Collins*, 715 F.3d at 1035–36 (rejecting argument that evidence should be excluded based on "lingering questions" the custody of the evidence "while it was in Mexico" because the evidence "never left the government's possession after the moment of receipt" from a Mexican source); *Vidacak*, 553 F.3d at 348-49 (evidence authenticated despite "three year gap between the creation of the documents [by a foreign army] and their seizure in 1998"). There is no reason to believe that Latvian government would have the motive or the ability to place extensive and detailed electronic evidence onto multiple computers. Moreover, Forensic Examiner Uitto will testify that the devices themselves show no trace of being altered after the time of seizure. Accordingly, the government submits that its chain of custody evidence is independently sufficient to authenticate the Cooler Master and RUSLAN WEB01 computers.

**B. Distinctive Documents Uniquely Associated With the Defendant Were Found on the Computers.**

As described in detail in the chart on p. 5, the computers that are the subject of this motion contain multiple authenticated documents that only the defendant would have access to, including copies of his passport, sensitive documents related to his bank account, documents that match documents obtained independently from Google, and documents containing his personal identifying information. These constitute "distinctive characteristics" independently sufficient to authenticate the computers under Rule 901(b)(4). *See Reed*, 780 F.3d at 265-67 (phone authenticated because it contained photos of the defendant and incoming text messages calling him by his first name); *Siddiqui*, 235 F.3d at 1322–23 (email authenticated because they contained the defendant's email address, nickname, signature and personal information relating to him). The fact that the Cooler Master computer contains emails from the "b0rland" Gmail account, which the government will confirm matches emails from that account obtained independently from Google, is also sufficient to authenticate the computer under Rule 901(b)(3)

which allows authentication through "[c]omparison …. with specimens which have been authenticated." *See Lorraine*, 241 F.R.D. at 546 (discussing 901(b)(3) as applied to electronic evidence); *Safavian*, 435 F.Supp.2d at 40 (holding that emails "not clearly identifiable on their own can be authenticated ... by comparison … with … e-mails that already have been independently authenticated").

**C. The Skype and Jabber Chats Found on the Cooler Master Computer Were Sent from Distinct Accounts Tied to the Defendant and His Co-Conspirator.**

The particular chats that the government intends to offer were sent to and from Skype and Jabber accounts that the government can independently tie to the defendant and his co-conspirator, Jurijs Martisevs. Specifically, the Skype chats are from "b0rland," a distinctive name that the defendant admitted was his Skype account, and the same name that the defendant used for his Gmail account, as confirmed by both the defendant himself and by subscriber records obtained from Google. The Jabber chats were from the Jabber account "qukufawu," which matches an email from Martisevs to a customer of the SERVICE which indicates that the administrators of the SERVICE used the Jabber names "Garrik" and "qukufawu." *See* US-30984. Courts have repeatedly found that evidence that messages were sent from an electronic communication account associated with the defendant is sufficient prima facie evidence for authentication, especially when the messages also contain the defendant's other identifying information. *See United States v. Hassan*, 742 F.3d 104, 133–34 (4th Cir.2014) (defendant's Facebook accounts authenticated by his email address, mailing address, and IP address); *United States v. Tank*, 200 F.3d 627, 629-31 (9th Cir. 2000) (authenticating chat room message, inter alia, by the fact they came from a screen name associated with the defendant); *United States v. Reilly*, 33 F.3d 1396, 1405-06 (3d Cir. 1994) (authenticating telegrams, in part, because they were sent to the defendant's office or telex number); *United States v. Browne*, 834 F.3d 403, 413

(3d Cir. 2016) (admitting evidence from Facebook account where the defendant "made significant concessions that served to link him to the Facebook conversations," such as his address and his occupation).

**D. The Computers Contain Extensive Information About the SERVICE that Only the SERVICE's Administrations Would Know and that the Defendant Himself Suggested Would Be on his Computers.**

As noted above, the Skype and Jabber chats recovered from the "Cooler Master" computer seized from the defendant's office included years of detailed discussions between the defendant and Martisevs about running the SERVICE. These chats are consistent with the defendant's statement that his Skype account was "Borland," that his co-administrator of the SERVICE was Martisevs, and that the two discussed the SERVICE primarily via Skype and Jabber. The chats also show particular information about the SERVICE, including discussions of where the SERVICE advertised and who was a member. In addition, the chats show an extensive discussed about the arrest of the administrator of "reFUD.me" who had a business relationship with the SERVICE.

Since the defendant by his own admission was one of two administrators of the SERVICE, detailed chats about the administration of the SERVICE are distinctive to him. Indeed, the Advisory Committee Note on Rule 901(b)(4) explained that "a document or … conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." Courts have rightly applied this rule to both electronic and hard copy evidence that contains information that only the defendant would be likely to know. *See United States v. Harvey*, 117 F.3d 1044, 1049–50 (7th Cir. 1997) (admitting notebooks found at the defendant's campsite in part because "[t]he writings .. make numerous references to [the defendant's] beloved dog, Drigo"); *United States v. Jones*, 107 F.3d 1147, 1150 (6th Cir. 1997) (holding that evidence can be authenticated where it "deals with a matter

sufficiently obscure or particularly within the knowledge" of the purported author, and finding a card properly authenticated based on references to the defendant's daughter and granddaughter); *United States v. Newton*, 891 F.2d 944, 947 (1st Cir. 1989) (authenticating document based on contents "from which it could be inferred that [the defendant] authored the document"); *United States v. Fluker*, 698 F.3d 988, 1000 (7th Cir. 2012) (authenticating emails based, in part, distinctive information in the emails that the defendant would uniquely "be in a position to know and discuss with [the recipient of the emails]")

In any event, even if the government could not tie the evidence on the computers to the defendant himself, the evidence would still be relevant and therefore admissible because the computers clearly contain evidence about the SERVICE that is the subject of the charged conspiracy. *See United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (holding that ledgers were sufficiently authenticated where information contained therein "confirm[ed] that the author or authors of the ledgers were intimately involved in the operation of the narcotics conspiracy at issue in the case" and noting that "the specific identity of the author is not necessary" for authentication purposes).

**Notice of Witness Order**

Officer Tikums, who will testify about the seizure of the RUSLAN WEB01 computer, cannot arrive in the country until the third day of trial (May 9), so his testimony is likely to be in the afternoon of May 9 or the morning of May 10. The government intends to have SA Kim testify about his review of evidence obtained from the RUSLAN WEB01 computer and sponsor summary charts that summarize that evidence. It is likely that Officer Tikums will be in the country and able to testify before SA Kim's testimony. However, in the event that SA Kim testifies before Officer Tikums arrives, the government respectfully submits that the Court

should either admit evidence obtained from the RUSLAN WEB01 computer based on the remaining authentication evidence discussed above, or conditionally admit that evidence on the condition that the government offer testimony from Tikums confirming that the RUSLAN WEB01 computer was seized from Telenet. *See* Fed. R. Evid. 104(b).

Alternatively, the government would seek permission to recall SA Kim after Officer Tikums so that SA Kim can discuss evidence from the RUSLAN WEB01 computer. The Court has the power to allow the recalling of a witness, particularly a case agent who does not need to be sequestered, where necessary for the efficient presentation of evidence. *See* Fed. R. Evid. 611; *United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017) (noting that in "core matters of trial management, a district court is granted broad discretion").

## Conclusion

For the forgoing reasons, the government respectfully requests that the Court issue a pretrial ruling finding that the evidence summarized in this motion is legally sufficient to meet the minimal requirements of authentication and conditionally admitting evidence obtained from the Cooler Master and RUSLAN WEB01 computer towers on the condition that the government offer authentication evidence at trial that does not differ in material respects from the evidence summarized in this motion.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By: ____/s/___________________________
Kellen S. Dwyer
Laura Fong
Assistant United States Attorneys
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700; Fax: (703) 299-3981

C. Alden Pelker
Trial Attorney
Computer Crime and Intellectual Property Section
U.S. Department of Justice, Criminal Division

April 20, 2018

**Certificate of Service**

I hereby certify that on April 20, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of filing (NEF) to counsel of record for the defense.

By: /s/

Kellen S. Dwyer
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700
kellen.dwyer@usdoj.gov